**FILED**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2011 FEB 23  P 1: 56

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

|  |  |
|---|---|
| JULIA DESOGUGUA, *Individually,* <br> *and on behalf of others similarly situated,* ) ) ) | |
| Plaintiff, ) | Case No. 1:11CV188-LO/JFA |
| v. ) | |
| WELLS FARGO BANK, N.A. d/b/a ) <br> WELLS FARGO HOME MORTGAGE ) <br> Serve: Corporation Service Company ) <br>     2730 Gateway Oaks Drive ) <br>     Suite 100 ) <br>     Sacramento, CA 95833 ) <br>                  ) <br> Defendants. ) | |

## CLASS COMPLAINT

COMES NOW the Plaintiff, JULIA DESOGUGUA, by counsel, individually, and on her own behalf and behalf of all others similarly situated and for her complaint against the Defendants she alleges as follows:

### I.    PRELIMINARY STATEMENT

1.    This is an action for actual, statutory and punitive damages, costs and attorney's fees brought pursuant to the Federal Equal Credit Opportunity Act (ECOA), 15 U.S.C. §1681, *et seq.* (alleged on a class basis for failure to send a lawful denial letter); the Virginia Equal Credit Opportunity Act (VECOA), Va. Code Ann. § 6.2-500, *et seq.*, as well as for a state claim of Breach of Contract (alleged on a class basis) (and in the alternative Promissory Estoppel).

2.     Defendants Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage (collectively "Wells Fargo") operate as a single mortgage lender and servicer.

3.     Ms. Desogugua brings this suit on behalf of herself individually, and a class of similarly situated Virginia residents to challenge the failure of Defendant to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

4.     Plaintiff's allegations are simple – when a mortgage lender promises (in writing even) to modify an eligible loan to prevent impending default, homeowners who live up to their end of the bargain have a right to expect that promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure and to which it agreed when receiving a huge taxpayer funded bailout.

5.     In 2008, Wells Fargo accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. On April 13, 2009, Michael J. Heid, Co-President of Wells Fargo, signed a contract with the U.S. Treasury (attached as Exhibit 1 and included by reference) agreeing to participate in HAMP -- a program in which Wells Fargo received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

6.     As a participating servicer in HAMP, Wells Fargo has, in turn, entered into written agreements with consumers for temporary trial modifications. Consumers like Ms. Desogugua have complied with these agreements by submitting the required documentation and making payments. Despite such efforts, Defendant has ignored its contractual obligations to modify their loans permanently.

2

7.     Importantly, it is this "consumer with Wells Fargo, Wells Fargo with consumer" direct contract that the Plaintiff seeks to enforce rather than the "Wells Fargo to U.S. Government, U.S. Government to Wells Fargo" agreement. The former is a simple common law contract to which the consumer is a party, while in the latter, they are only a third party.

## II.     Jurisdiction and Venue

8.     This Court has federal question jurisdiction under the the ECOA, 15 U.S.C. §1691e.

9.     This court also has jurisdiction over the state law claims by supplemental jurisdiction 28 U.S.C. §1367, and by diversity, 28 U.S.C. §1332.  The parties – the Plaintiff with the putative class versus the Defendant – are residents of different states.

10.     Further, this putative class action is properly brought before this court pursuant to 28 U.S.C. § 1332(d) in that the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and all members of the class – alleged to be over 100 Virginia consumers - are citizens of a State different from the Defendant.

11.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District and Division, Defendant regularly conducts business in here, and the named Plaintiff resides here.

## III.     The Parties

12.     The Plaintiff, JULIA DESOGUGUA ("Ms. Desogugua"), is a natural person and resident of the State of Virginia.  Plaintiff is a "consumer" and "person" protected by the ECOA.

3

13.     Upon information and belief, WELLS FARGO BANK, N.A., is a bank registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia and is a "creditor" as governed by the ECOA.

14.     Upon information and belief, WELLS FARGO HOME MORTGAGE and was and is a wholly owned subsidiary of Wells Fargo Bank, N.A. created and operated with shared management and control as the servicing agent for Wells Fargo Bank, N.A. Upon information and belief the Plaintiff alleges that Wells Fargo Home Mortgage is also a "creditor" as governed by the ECOA.

15.     Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A. is the entity that contracted with the United States Department of Treasury as alleged below.

16.     Wells Fargo Home Mortgage is the entity that contracted and issued the trial plan for Ms. Desogugua.

17.     For all factual and legal purposes relevant to this complaint, both Defendants operated as a single mortgage lending and servicing entity.  It has shared ownership, shared management and represented to the public and Ms. Desogugua that they were one and the same.

## IV.    FACTUAL BACKGROUND

### a.  **The Foreclosure Crisis**

18.     Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default[1].  Virginia reported 17,669 properties with foreclosure filings for the second quarter of 2010, the 11th highest activity level in the nation.  The

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.

latest total represents a 22 percent increase from the first quarter of the year and nearly

15 percent above the level reporting for the second quarter of 2009[2].

19.     Increased foreclosures have a detrimental effect not just on the borrowers

who lose unique property and face homelessness, but also on the surrounding

neighborhoods that suffer decreased property values and municipalities that lose tax

revenue.

b.     <strong><u>Creation of the Home Affordable Modification Program</u></strong>

20.     Motivated in significant part by such concerns, Congress passed the

Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with

the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together,

the "Act"). 12 U.S.C.A. §5201 et. seq. (2009).

21.     The purpose of the Act is to grant the Secretary of the Treasury the

authority to restore liquidity and stability to the financial system, and ensure that such

authority is used in a manner that "protects home values" and "preserves

homeownership."12 U.S.C.A. §5201.

22.     The Act established the Troubled Asset Relief Program, or TARP. 12 U.S.C.

§ 5211. In exercising its authority to administer TARP, the Act mandated that the

Secretary of Treasury take into consideration the "need to help families keep their

homes and to stabilize communities." 12 U.S.C. § 5213(3).   It further mandated that the

Secretary "shall implement a plan that seeks to maximize assistance for homeowners"

and use the Secretary's authority over servicers to encourage them to take advantage of

programs to "minimize foreclosures" and to use credit enhancement and loan

---

[2]   www.realtytrac.com/ContentManagement/Library.aspx?ChannelID=13&ItemID=9600

guarantees to "facilitate loan modifications to prevent avoidable foreclosures." 12

U.S.C.A. §5219.

23.     On February 18, 2009, the Treasury Secretary and the Director of the

Federal Housing Finance Agency created a uniform loan modification protocol,

previously identified as HAMP, the program that is at issue in this case.

24.     HAMP is funded by the federal government, primarily with TARP funds.

In the last two years, the Treasury Department has allocated at least $75 billion to

HAMP, of which at least $50 billion is TARP money.

25.     Under HAMP, the federal government incentivizes participating servicers

to enter into agreements with struggling homeowners that will make adjustments to

existing mortgage obligations in order to make the monthly payments more affordable.

Servicers receive $1,000.00 for each HAMP modification.

### c.     **Wells Fargo's Broken Promises Under HAMP**

26.     The mortgage industry entities that perform the actual interface with

borrowers – including such tasks as payment processing, escrow maintenance, loss

mitigation and foreclosure – are known as "servicers." Servicers typically act as the

agents of the entities that hold mortgage loans. Wells Fargo is a servicer and its actions

described herein were made as agents for the entities that hold mortgage loans.

27.     Should a servicer elect to participate in HAMP, they execute a Servicer

Participation Agreement ("SPA") with the federal government[3]. On April 13, 2009

Michael J. Heid, Co-President of Wells Fargo Bank, NA, executed an SPA, thereby

---

[3] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

making Wells Fargo a participating servicer in HAMP. A copy of this SPA is attached hereto as Exhibit 1.

28.    The SPA executed by Wells Fargo incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA 1.A.), and are incorporated by reference herein.

29.    The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." (SPA 1.A., 2.A.)[4]

30.    A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan[5]. The Trial Period Plan defines a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

31.    Wells Fargo offers Trial Period Plans to eligible homeowners by way of a Trial Period Plan Agreement, which describes the homeowner's duties and obligations

---

[4] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation— Frequently Asked Questions ("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5). These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiff.

[5] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

under the plan and contractually promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

32.    If the homeowner executes the Trial Period Plan Agreement, complies with objective documentation requirements and makes all three Trial Period Contract monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

33.    There is no lender or servicer discretion involved or permitted.  Once the servicer/lender contracts a Trial Period Plan, the consumer will be entitled to a permanent modification so long as they produce the defined set of documents required to verify the facts previously stated and also comply with the plan payment requirements during the Trial Period Plan.  Further, the terms of that permanent modification are also non-discretionary and are objectively determinable for each consumer based on the "waterfall" analysis required under the HAMP program.

34.    Wells Fargo has routinely failed to live up to its end of Trial Period Plan Agreements and to offer permanent modifications to homeowners. In March 2010, the U.S. Treasury reported that Wells Fargo had 378,480 HAMP-eligible loans in its portfolio. Of these loans, just 30,826 resulted in permanent modifications (less than 8 %) even though many more homeowners had made the payments and submitted the documentation required by their Trial Period Plan Agreement. The Treasury Report is attached hereto as Exhibit 6.

35.    By failing to live up to the Trial Period Plan Agreements and convert them into permanent loan modifications, Wells Fargo is not only leaving homeowners in limbo and stressful anxiety, wondering if their home can be saved, Wells Fargo is also

8

preventing homeowners from pursuing other avenues of resolution, including obtaining alternate lending or using the money they are putting toward Trial Period Plan payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default or reducing the harm from it.

### d.   Factual Allegations as to Ms. Desogugua

36.    Ms. Desogugua purchased her home in January, 2005 and took out a mortgage with Wells Fargo in the amount of approximately $421,000.

37.    Ms. Desogugua's mortgage was an interest only adjustable rate mortgage, with the interest rate scheduled to adjust after five years.

38.    Ms. Desogugua's monthly payments for the first five years were "interest-only" payments in the amount of $2,400 per month. Ms. Desogugua made her payments on time each month.

39.    Ms. Desogugua consistently paid her mortgage on time.

40.    In the Fall of 2009, Ms. Desogugua experienced the perfect storm of financial hardships. While going through a divorce, her daughter was born prematurely, requiring her to miss months of work. In addition to incurring significant medical bills, Ms. Desogugua was also caring for her two elderly parents who had moved into her home.

41.    On or about November 1, 2009, Ms. Desogugua was struggling to stay current on her mortgage and was worried about the impending rate adjustment on her loan, so she contacted Wells Fargo for assistance.

### Ms. Desogugua Enters HAMP Through Wells Fargo

42.    When Ms. Desogugua contacted Wells Fargo and explained her situation, the Wells Fargo representative suggested that Ms. Desogugua apply for HAMP.

43.     During that telephone call, the Wells Fargo representative requested detailed income and expense information over the telephone in order to "pre-qualify" Ms. Desogugua for HAMP. Based on this information, the representative advised Ms. Desogugua that she was eligible for the HAMP program and would receive information in the mail.

44.     On December 1, 2009, Ms. Desogugua made her December mortgage payment.

45.     On or about December 4, 2009, Ms. Desogugua received an application for a HAMP Trial Period Plan from Wells Fargo.

46.     Immediately thereafter, Ms. Desogugua forwarded her completed application to Wells Fargo with the requested documentation including the signed Wells Fargo Request for Modification Affidavit, income verification documents and the required signed 4506-T Request for Tax Return form to complete her application for the HAMP.

47.     Ms. Desogugua received a document entitled "Home Affordable Modification Loan Trial Period (Step One of Two Step Documentation Process)", which stated that the plan was effective on January 1, 2010 and would run from January 2010 through March 2010.  Ms. Desogugua's monthly mortgage payments were reduced to the amount of $1,808.00.  She signed the form along with another 4506-T Request for Transcript of Tax Form and forwarded all of the required documentation back to Wells Fargo prior to the January 1, 2010 deadline indicated on the correspondence. Attached as Exhibit 7 is a copy of the Plaintiff's Home Affordable Modification Trial Period Plan[6].

---

[6] Plaintiff only has a copy of the signed Trial Period Plan as discussed in Paragraph 56 of this Complaint.

48.     This Trial Period Plan Agreement was entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

49.     The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following the month in which the last Trial Period Payment is due," and that "TIME IS OF THE ESSENCE."

50.     The last page of the Trial Period Plan Agreement provided Ms. Desogugua with Trial Period Mortgage Payment Coupons. The correspondence stated (in bold), **"These payments should be sent instead of, not in addition to, your normal monthly mortgage payment."**

51.     Ms. Desogugua first Trial Period payment was automatically deducted from her checking account on December 21, 2009, prior to the January 1, 2010 deadline.

52.     Wells Fargo continued to automatically deduct Ms. Desogugua's Trial Period payment for the months of February and March pursuant to the Trial Period Plan.

### Wells Fargo Fails to Follow HAMP

53.   In March 2010, Wells Fargo forwarded correspondence to Ms. Desogugua that requested "missing required documents" (that were submitted with the original application). Because she had already provided this information to Wells Fargo, Ms. Desogugua called Wells Fargo to verify what information they needed.

54.   After speaking with the Wells Fargo representative, Ms. Desogugua forwarded the requested documentation to Wells Fargo.

55.   Wells Fargo automatically deducted Ms. Desogugua April Trial Period payment from her checking account.

56.   In April 2010, Ms. Desogugua spoke with a Wells Fargo representative who indicated they would re-send her the Trial Period Plan because they were missing their signed copy with her signature.

57.   On April 7, 2010, Ms. Desogugua signed the Trial Period Plan Agreement, again, and forwarded it to Wells Fargo.

58.   Wells Fargo automatically deducted Ms. Desogugua May Trial Period payment from her checking account.

59.   On or about May 17, 2010, Wells Fargo forwarded correspondence to Ms. Desogugua that stated they "are unable to adjust the terms of [her] mortgage..." A copy of the May 17, 2010 letter is attached hereto as Exhibit 8.

60.   The reason for the denial was:

> We are unable to offer you a Home Affordable Modification because you did not provide us with the documents we requested. A notice which listed the specific documents and the time frame required to provide them was sent to you more than 30 days ago. Any trial period payments you have made will be applied to your loan in accordance with your current loan documents.

61.     Immediately upon receipt of this letter, Ms. Desogugua called to inquire about the "missing documentation" which she had already provided. Wells Fargo informed her that she needed to send in a "hardship letter," which she sent in immediately thereafter.

62.     On or about May 23, 2010, Wells Fargo forwarded correspondence to Ms. Desogugua that stated "[she] may be eligible for the Home Affordable Modification Program..." and requested she submit a new application.

63.     Ms. Desogugua promptly re-submitted a new HAMP application.

64.     Wells Fargo forwarded additional correspondence dated May 23, 2010 to Ms. Desogugua that stated her loan was in default for failure to make payments due. The letter indicated that she needed to bring her loan current by June 22, 2010 to avoid an acceleration of her Mortgage Note and a possible foreclosure.

65.     The letter indicated that her total delinquency as of May 23, 2010 was $5,098.55.

66.     On or about June 18, 2010, Wells Fargo automatically deducted $2,399.46 (or the unmodified payment amount) from Ms. Desogugua's bank account.

67.     Ms. Desogugua made several attempts to contact Wells Fargo over the next several weeks. Wells Fargo representatives continued to inform her that she was in default, despite her having made every monthly payment on time.

68.     Wells Fargo insisted that she pay roughly $5,000.00 in arrearages to avoid acceleration and a possible foreclosure. Ms. Desogugua attempted to work out a payment plan over two to three months to pay off the alleged arrearage, which was denied by Wells Fargo.

13

69.     On or about July 26, 2010, Wells Fargo sent Ms. Desogugua a letter stating that her loan "has been referred to our attorney with instructions to begin foreclosure proceedings."

70.     On or about July 28, 2010, Ms. Desogugua forwarded a check to Wells Fargo in the amount of $2,500.00 in order to avoid a foreclosure on her home.

71.     Wells Fargo returned the check uncashed to Ms. Desogugua by correspondence dated August 4, 2010, stating that they "are returning the funds because they do not represent the total amount due on your account."

72.     The August 4th letter also stated that Ms. Desogugua's loan was in "Foreclosure status" and instructed her to contact their attorney's office, Samuel I. White, P.C.

73.     Prior to receipt of the August 4th letter from Wells Fargo, Ms. Desogugua sent another check in the amount of $3,750.00 to Wells Fargo, again, in an attempt to bring her loan current and avoid a foreclosure on her home.

74.     Wells Fargo returned the second check to her by correspondence dated August 20, 2010 stating that they "are returning the funds because they do not represent the total amount due on your account."

### Wells Fargo Forecloses on Ms. Desogugua's Home

75.     By correspondence dated August 10, 2010, Samuel I. White, P.C. forwarded Ms. Desoguga a Notice of Sale for her house.

76.     The foreclosure sale occurred in August 27, 2010.

77.     On or about September 15, 2010, Samuel I. White, P.C. sent Ms. Desogugua a Notice to Vacate, indicating that she was no longer the owner of her home

and that she "must vacate said real property within five (5) days of receipt of this notice."

78.   Nonetheless, Wells Fargo is still communicating with Ms. Desogugua in an attempt to consider her for a HAMP modification.

79.   Since the sale, Ms. Desogugua has re-submitted HAMP applications in October 2010, November 2010, and February 2011, per Wells Fargo's request.

80.   Bank of America, N.A. (the owner of her home) and Samuel I. White, P.C. has filed a Summons for Unlawful Detainer against Ms. Desogugua in Prince William County General District Court under Case No. GV10021038-00.

81.   The trial in that matter is scheduled for Friday, February 25, 2011.

82.   Ms. Desogugua has no adequate remedy at law.

## COUNT ONE:  BREACH OF CONTRACT

## CLASS CLAIM

83.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

84.   **The Contract Class**.  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Ms. Desogugua brings this action for herself and on behalf of a class (the "Class") initially defined as follows:

> All natural persons who on any date on or after April 13, 2009, (a.) with regard to a mortgage loan secured by their personal residence (b.) located in the Commonwealth of Virginia and otherwise eligible for application of HAMP, (c.) entered into a written Trial Period Plan Agreement with Wells Fargo and thereafter (d.) made their three trial payments as therein required.

> Excluded from the class definition are borrowers to whom Wells Fargo sent, prior to the effective date stated in the consumer's Trial Period Plan

Agreement, either: (a) a permanent Home Affordable Modification Agreement, or (b) a written denial of eligibility.

Also excluded from the class definition are any employees, officers, directors of Wells Fargo Bank, N.A. or any of its subsidiary or related companies, any attorney appearing in this case, and any judge assigned to hear this action.

85.     **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Ms. Desogugua does not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants. However, on information and belief, Ms. Desogugua alleges that the class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

86.     Based on the size of the modifications at issue, Ms. Desogugua believes the amount in controversy exceeds $5 million. In the alternative, Ms. Desogugua believes the amount in controversy exceeds $5 million based on the equity loss that could result to putative class members if they were to lose their homes to foreclosure as a result of Defendants' failure to convert temporary modifications into permanent modifications.

87.     **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting only individual members.  All members of the class have been subject to and affected by the same conduct. These common legal and factual questions include, among other things and without limitation:

a.  The review and interpretation of form contracts and uniform loan modification processing requirements;

b.  The nature, scope and operation of Defendants' obligations to homeowners under HAMP;

c.  Whether Defendants' receipt of an executed Trial Period Plan Agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Defendants to offer class members a permanent HAMP modification;

d.  Whether Defendants' failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing; and

e.  Whether the Court can order Defendants to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

88.   **Typicality. Fed. R. Civ. P. 23(a)(3)**. Ms. Desogugua's claims are typical of the claims of each Class member for the reasons alleged in the previous paragraph and in that Ms. Desogugua and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.  In addition, Ms. Desogugua is entitled to relief under the same causes of action as the other members of the Class.

89.   **Adequacy.** Ms. Desogugua is an adequate representative of the Class because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent, she has retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously.  Fed. R. Civ. P. 23(a(4). Ms. Desogugua and her Counsel will fairly and adequately protect the interests of members of the Class.

17

90.   **Superiority.** As alleged previously, there are significant questions of law and fact common to the Class members.  These predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).  The claims in this case and the circumstances of class members are such that individual prosecution would be extremely unlikely and would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class themselves could afford such individual litigation; it would be an unnecessary burden on the courts.  Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

91.   **Injunctive Relief Appropriate for the Class.** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to the Ms. Desogugua and the Class members. Fed. R. Civ. P. 23(b)(2).

92.   As described above, the Trial Period Plan Agreements sent by Defendants to Ms. Desogugua and class members constituted valid contract offers.

93.    By executing the Trial Period Plan Agreements and providing it to Defendants along with the supporting documentation, Ms. Desogugua and class members accepted Defendants' offers.

94.    Alternatively, Ms. Desogugua's and class members' return of the Trial Period Plan Agreements constituted contract offers.  Acceptance of these offers occurred when Defendants accepted Trial Period Plan Agreement payments.

95.    The Trial Period Plan Agreement payments to Defendants by Ms. Desogugua and class members and their compliance with the other terms of such Agreements, all of which actions were requested by Wells Fargo and none of which were pre-existing legal obligations, constituted consideration. By making those payments, Ms. Desogugua and each class member gave up the ability to pursue other means of saving their homes, and Defendants received payments it might otherwise not have.

96.    As additional consideration, Ms. Desogugua and class members provided a large amount of private financial and other information to the Defendants, access to which it would not have otherwise had access.

97.    Ms. Desogugua and class members and Defendants thereby formed enforceable contracts.

98.    By failing to offer permanent HAMP modifications, Defendants breached its contracts.

99.    In the alternative, Ms. Desogugua alleges that they and each member of the class did reasonably rely upon representations made by Wells Fargo in and related to the Trial Period Plan Agreement to their determinant and plead that Wells Fargo be estopped from failing to perform in accordance with these representations.

100.  Ms. Desogugua and each class member have suffered actual damages and are threatened with additional harm from Defendants' breach. By making Trial Period Plan payments both during and after the Trial Period Contract, Ms. Desogugua and class members lost other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. On information and belief, some putative class members have also suffered additional harm in the form of foreclosure activity against their homes.

101.  To the extent that actual damages will not fully and fairly compensate each class member, they are also entitled to specific performance and other appropriate injunctive relief.

102.  Ms. Desogugua requests reinstatement of her mortgage, rescission of the foreclosure sale and the specific performance of her permanent modification.

## COUNT TWO: VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT 15 U.S.C. §1691(d) and Virginia Code §59.1-21.21:1

### CLASS CLAIM

103.  Ms. Desogugua repeats and re-alleges every allegation above as if set forth herein in full.

104.  **The ECOA Class.** Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Ms. Desogugua brings this action for herself and on behalf of a class (the "Class") initially defined as follows:

> All natural persons who on any date on or after April 17, 2009, (a.) with regard to a mortgage loan secured by their personal residence (b.) located in the Commonwealth of Virginia, (c.) provided Wells Fargo a completed "Making Home Affordable Program Request For Modification and Affidavit" (Exhibit 9), and thereafter (d.) were not approved for the Modification.

Excluded from the class definition are any consumers who received a written notice from Wells Fargo within 30 days of completing a HAMP application that provided a statement of reasons for the application denial and the additional statutory disclosures required under the ECOA.

Also excluded from the class definition are any employees, officers, directors of Wells Fargo Bank, N.A. or any subsidiary or related company, any attorney appearing in this case, and any judge assigned to hear this action.

105.   **Numerosity. Fed. R. Civ. P. 23(a)(1).**   Ms. Desogugua does not know the exact size or identities of the members of the proposed class or sub-class, since such information is in the exclusive control of Defendants. However, on information and belief, Ms. Desogugua alleges that they encompass many hundreds of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed class or sub-class are so numerous that joinder of all members is impracticable.

106.   **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**   Common questions of law and fact exist as to all members of the Class or sub-class.  These questions predominate over the questions affecting only individual members.  All members have been subject to and affected by the same conduct. These common legal and factual questions include, among other things and without limitation:

a.   The review and interpretation of form contracts and uniform loan modification processing requirements;

b.   Whether Wells Fargo's rejection of class member applications for HAMP loan modifications constituted adverse actions;

    c.  Whether in their application for the loan modifications consumers were applying for credit under the ECOA;

    d.  Whether it was Wells Fargo's procedure to fail to send adverse action notice letters that complied with the ECOA; and

    e.  Whether the Court can order Defendants to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

107.  **Typicality. Fed. R. Civ. P. 23(a)(3)).**  Ms. Desoguga's claims are typical of the claims of each Class member for the reasons alleged in the previous paragraph and in that Ms. Desogugua and the other members were subject to the same conduct, signed the same application and were met with the same absence of a permanent modification.  In addition, Ms. Desogugua is entitled to relief under the same causes of action as the other members of the Class.

108.  **Adequacy.**  Ms. Desogugua is an adequate representative of the Class because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent, she has retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously.  Fed. R. Civ. P. 23(a)(4).  Ms. Desogugua and her Counsel will fairly and adequately protect the interests of class members.

109.  **Superiority.**  As alleged previously, there are significant questions of law and fact common to the Class members.  These predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).  The claims in this case and the circumstances of class members are such that individual prosecution

would be extremely unlikely and would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the members of the Class to individually redress effectively the wrongs done to them. Even if the members themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

110.    **Injunctive Relief Appropriate for the Class.** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class or sub-class, making appropriate equitable injunctive relief. Fed. R. Civ. P. 23(b)(2).

111.    The "Making Home Affordable Program Request For Modification and Affidavit" completed by Ms. Desogugua and each putative class member was a completed application for credit. In each instance, Ms. Desogugua or other class members was asking Wells Fargo to obtain more favorable credit terms.

112.    At all times relevant hereto, it was Wells Fargo's policy not to send timely notice letters to consumers when it denied their applications as alleged.

113.    Wells Fargo also failed to provide the statutory disclosures required by the ECOA to Ms. Desogugua and the class members as required under the ECOA.

114.    The above-alleged actions and omissions of the Defendants violated the ECOA, 15 U.S.C. §1691(d) and the Virginia Equal Credit Opportunity Act (VECOA),

Virginia Code §59.1-21.21:1. Ms. Desogugua and the putative class are entitled to
attorney's fees and costs pursuant to 15 U.S.C. §1691e and Virginia Code § 59.1-21.23.

115.   The Defendants are liable to Ms. Desogugua and the putative class for
punitive damages of $10,000.00 per violation pursuant to Virginia Code § 59.1-21.23.
The Defendant's violations were widespread, without legal justification, and greatly
impacted class members. Given the net worth of Wells Fargo, it is also unlikely that any
lesser remedy would adequately deter it from further non-compliance.

116.   Ms. Desogugua and the putative class are entitled to declaratory and
injunctive relief requiring the Defendants' compliance with the ECOA pursuant to 15
U.S.C. §1691e.

## VI.   CONCLUSION

WHEREFORE, Ms. Desogugua respectfully requests the following relief:

1.   Certify the ECOA and Contract claims in this case as a class action and
appoint Ms. Desogugua to be a class representative and her counsel to be class counsel;

2.   Enter a judgment declaring the acts and practices of Defendants
complained of herein to constitute a breach of contract, as well as a declaration that they
are required to offer permanent modifications to class members on the terms promised
in class members' temporary modifications;

3.   Grant a permanent or final injunction enjoining Defendants' agents and
employees, affiliates and subsidiaries, from continuing to harm Ms. Desogugua and the
members of the Class;

4.   Order Defendants to adopt and enforce a policy that requires appropriate
training of its employees and agents regarding their duties under HAMP;

5. Order specific performance of Defendants' contractual obligations together with other relief required by contract and law;

6. Award actual, statutory, and punitive damages as pled;

7. Award Ms. Desogugua and her counsel attorneys fees and the costs of this action, including the fees and costs of experts;

8. Grant Ms. Desogugua and the Class such other and further relief as this Court finds necessary and proper.

**TRIAL BY JURY IS DEMANDED.**

**JULIA DESOGUGUA**

By_____
Counsel

Kristi Cahoon Kelly, Esq., VSB #72791
J. Chapman Petersen, Esq., VSB # 37225
Scott A. Surovell, Esq., VSB # 40278
SUROVELL ISAACS  PETERSEN & LEVY PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
Telephone (703) 277-9774
Facsimile (703) 591-9285
kkelly@siplfirm.com

LEONARD A. BENNETT, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 201
Newport News, Virginia 23606
Telephone (757) 930-3660
Facsimile (757) 930-3662
lenbennett@clalegal.com

Matthew J. Erausquin, VSB#65434
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone:   (703) 273-777
Facsimile:   (888) 892-3512
matt@clalegal.com

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 (Fax)
dale@pittmanlawoffice.com

*Counsel for Plaintiffs*